IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SHAWN DONALD,                             )
                                          )    CASE NO. 5:20-2526
                                          )
              Plaintiff,                  )
                                          )
       vs.                                )
                                          )    MAGISTRATE JUDGE
                                          )    JONATHAN D. GREENBERG
                                          )
COMMISSIONER OF SOCIAL                    )
SECURITY,                                 )    **MEMORANDUM OF OPINION AND**
                                          )    **ORDER**
              Defendant.                  )

Plaintiff, Shawn Donald ("Plaintiff" or "Donald"), challenges the final decision of Defendant,

Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying his application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i),

423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent

of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's

final decision is VACATED AND REMANDED.

## I. PROCEDURAL HISTORY

On September 27, 2018, Donald filed an application for SSI, alleging a disability onset date of July

12, 2018 and claiming he was disabled due to gunshot wound to the abdomen resulting in 50% loss of

intestines, arthritis, plate in right knee, screws and plate in left ankle, depression, and paranoid

schizophrenia.  Transcript ("Tr.") at 12, 374, 409.  The application was denied initially and upon

reconsideration, and Donald requested a hearing before an administrative law judge ("ALJ").  Tr. 313.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On January 16, 2020 an ALJ held a hearing, during which Donald, represented by counsel, and an impartial vocational expert ("VE") testified. Tr. 141-180. On February 26, 2020, the ALJ issued a written decision finding that Donald was not disabled. Tr. 12-33. The ALJ's decision became final on September 18, 2020, when the Appeals Council declined further review. Tr. 1-3.

On November 10, 2020, Donald filed his Complaint to challenge the Commissioner's final decision. Doc. No. 1. The parties have completed briefing in this case. Doc. Nos. 16, 17. Donald asserts the following assignments of error:

> (1) Whether it was error for the ALJ to find that Mr. Donald retained the residual functional capacity for light work when the evidence demonstrates that Mr. Donald should have been evaluated based upon a residual functional capacity for sedentary work.
>
> (2) Whether it was error for the ALJ to find that Mr. Donald was not illiterate when the ALJ found that Mr. Donald's severe reading disorder limits Mr. Donald to simple oral instructions.

Doc. No. 16, p. 1.

## II. EVIDENCE

### A.     Personal and Vocational Evidence

Donald was born in 1967 and was 51 years-old, which is defined as an individual closely approaching advanced age, on the date the application was filed. Tr. 30. *See* 20 C.F.R. § 416.963. He has past relevant work as a general laborer. Tr. 30.

### B.     Relevant Medical Evidence[2]

On March 20, 2018, Donald went to the emergency room for right shoulder and neck pain four days after he helped a friend move a water tank and the friend's hand slipped and Donald had to "compensate to keep the tank from falling." Tr. 469. Upon exam, he had full musculoskeletal range of motion and muscle strength, including in his shoulder, and "some tenderness" in his shoulder. Tr. 472.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

An x-ray showed mild degenerative changes in his shoulder and spine. Tr. 472.  He was given anti-inflammatories and discharged.  Tr. 474.

On June 4, 2018, Donald returned to the emergency room complaining of pain in his right shoulder for the past three months.  Tr. 481.  Upon exam, he had 5/5 strength in his upper and lower extremities and no abnormalities.  Tr. 485.  His right shoulder x-rays from his prior visit were reviewed and he was diagnosed with a trapezius strain.  Tr. 485-486.

On July 12, 2018, Donald went to the emergency department for a gunshot wound to his abdomen.  Tr. 496.  Upon exam, he had good range of motion in his extremities, no tenderness in his arms and legs, and full strength and intact sensation.  Tr. 497.  He underwent an exploratory laparotomy and was diagnosed with a gunshot wound to the abdomen, small bowel and mesenteric injuries times three, liver laceration, and iatrogenic splenic capsular tear.  Tr. 529.  He was discharged from the hospital on July 18 in stable condition.  Tr. 506.

On December 17, 2018, Donald saw Mark Vogelgesang, M.D., for a physical consultative examination.  Tr. 698-706.  Donald reported arthritis in his right knee and plates and screws in his right knee and left ankle from prior surgeries in 2016.  Tr. 698.  He described fracturing his left ankle after falling down and having "surgery with pins."  Tr. 698.  Physical therapy had been very helpful.  Tr. 698.  His ankle occasionally swelled in cold weather, occasionally gave out, and he reported "pretty good movement" in it.  Tr. 698.  His knee was shattered when he fell into a pit and he had a plate and screws below his knee.   Tr. 699.  He reported slight edema in his knee, which he treated with ice, and it will occasionally catch or lock and occasionally throb, especially at night.  Tr. 699.  He had a cane at the exam "to prevent falls" when his right leg gives out, although "this has not been evaluated."  Tr. 699.  He rated his ankle pain 7/10; his knee pain 9/10, and his right shoulder pain 10/10.  Tr. 699.  He reported being able to sit for an hour, stand for 20 minutes, and walk about 80 yards before the pain bothers him.

3

Tr. 699.  He can lift and carry about 25 pounds.  Tr. 699.  Upon exam, he had decreased range of motion and full strength in his right shoulder.  Tr. 699.  He had a slightly swollen right knee and no signs of crepitus or joint changes.  Tr. 701.  He had good mobility in his left ankle with a slight decrease in inversion.  Tr. 701.  His gait showed slight stiffness of the right knee walking with the cane and he was able to heel to toe walk with the cane and stand on his toes.  Tr. 701.  He was able to touch his toes and had a good range of motion in his back.  Tr. 701.  He had decreased sensation in his right foot, right leg and right thigh to sharp sensation and he had normal reflexes.  Tr. 701.  An x-ray of his right knee showed post-operative changes with plates and screws in the medial tibial plateau with minimal narrowing of the joint space.  Tr. 697.  A left ankle x-ray showed plate and screws along the distal fibula; the two long screws extending into the tibia were both fractured at the mid portion within the tibial and mild tibiotalar arthropathy and a small calcaneal spur were present.  Tr. 697.  Dr. Vogelgesang opined that it was possible that Donald could tolerate light to sedentary work, he may have to avoid extensive lifting over his shoulders, doing steps, and walking at heights, and he may need to rest periodically during the daytime "because of being in poor shape."  Tr. 702.

On December 18, 2018, Donald saw Cheryl Benson-Blankenship, Ph.D., for a psychological consultative evaluation.  Tr. 708.  He used a cane "for ambulatory support."  Tr. 708.  Dr. Benson-Blankenship referenced a report from a psychological examination Donald had had in 2007: "testing that indicates that [Donald] has a lot of difficulty with reading and writing and epidemic [sic] related issues."  Tr. 709.  She wrote, "[Donald] is functionally illiterate according to records."  Tr. 709.  Upon exam, he had difficulty spelling the word "world" forwards and backwards and was unable to complete serial 7's or 3's.  Tr. 710.  Dr. Benson-Blankenship diagnosed polysubstance dependence and alcohol use disorder, both in self-reported long term remission; reading disorder; adult antisocial personality disorder; major depressive disorder, recurrent, moderate; and, generalized anxiety disorder.  Tr. 711.

4

She opined that Donald had limitations in his ability to understand, remember and carry-out instructions based on Donald's reports that he "dropped out of school and was always in special education.  He is illiterate."  Tr. 712.

On December 21, 2018, Donald saw his primary care physician, Colin Drolshagen, M.D., for a follow-up visit regarding memory loss, shoulder pain and medication refill.  Tr. 715.  Dr. Drolshagen noted that Donald had not started steroids for his chronic shoulder pain.  Tr. 715.  Donald reported whole body joint pain since his gunshot wound in July: knees, hips, sides, back.  Tr. 715.  He had been taking ibuprofen but it was not helping.  Tr. 715.  Dr. Drolshagen diagnosed memory loss and chronic joint pain and questioned whether Donald was suffering from early onset Alzheimer's and provided him with a number for geriatrics.  Tr. 718.

On May 6, 2019, Donald saw Joshua Eugene Nash, D.O., a trauma physician, for a follow-up of his gunshot wound.  Tr. 800.  Donald reported residual aches and pains from his gunshot wound and, despite Dr. Nash's assurances, remained very concerned that the bullet in his abdominal wall will move and hurt him such that he had been altering the way he sleeps.  Tr. 800.  Donald was to follow-up in June to have the bullet removed.  Tr. 804.

On May 22, 2019, Donald saw Dr. Drolshagen for a follow-up.  Tr. 785.  He reported right knee pain for over a month.  Tr. 785.  He denied an inability to bear weight, weakness, loss of sensation, and numbness and tingling, and endorsed his knee catching/giving out.  Tr. 785.  Upon exam of his right knee, he had abnormal patellar mobility (+ grind) and abnormal meniscus, normal range of motion, normal alignment, no LCL or MCL tenderness or laxity, and tenderness in the medial joint line and patellar tendon.  Tr. 788.  Dr. Drolshagen assessed acute pain of his right knee, prescribed a trial of Mobic, and referred him to a trial of physical therapy and an orthopedic physician.  Tr. 788.

On July 19, 2019, Donald saw Kiel J. Pfefferle, M.D. at the Orthopedics and Sports Medicine

Department.  Tr. 920.  Donald reported pain since his injury four years prior that had gradually worsened.  Tr. 920.  His pain was sharp and improved with rest and use of a cane and exacerbated by sleeping.  Tr. 920.  He was able to walk two blocks and was somewhat able to use stairs.  Tr. 921.  Upon exam, he had an antalgic gait, and, in his right knee, a normal range of motion, mild varus alignment, stable to varus/valgus stress testing, crepitus, medial joint line tenderness, and normal reflexes.  Tr. 923. An x-ray showed mild to moderate degenerative arthritis of the right knee.  Tr. 924.  Dr. Pfefferle commented that Donald had tried little conservative treatment and that he had a good range of motion but it was "quite painful."  Tr. 924.  He recommended conservative management of the right knee, including medication and a knee brace.  Tr. 924.  Donald declined physical therapy, stating that he would continue his home exercises, and agreed to consider a cortisone injection.  Tr. 924.

On August 1, 2019, Donald followed up with Dr. Drolshagen for right knee pain.  Tr. 773.  His exam findings were the same as his prior visit.  Tr. 776.  On September 26, Donald returned, had similar exam findings, and received a steroid injection at his right knee.  Tr. 768.

At a follow-up visit with Dr. Drolshagen on October 28, 2019, Donald reported that the benefit from his knee injection had lasted for approximately three to four weeks and was wearing off.  Tr. 839. His exam findings were as his prior visit.  Tr. 842.  Dr. Drolshagen completed a Medical Source Statement on Donald's behalf.  Tr. 796- 798.  He reported treating Donald for depression, anxiety, osteoarthritis of his knee/shoulder and memory loss and that his symptoms included poor short term memory and chronic knee and shoulder pain.  Tr. 796.  He ambulates with a cane and has trouble with overhead use of his shoulder.  Tr. 796.  Dr. Drolshagen opined that Donald would be absent from work more than four days per month.  Tr. 796.  He could sit for one hour at a time but less than two hours total in an eight hour work day; walk about a block without rest; stand for 10 minutes at a time and stand/walk less than two hours total in an eight hour work day; rarely lift up to 20 pounds; rarely or

6

never perform postural limitations; and he would have to shift positions at will, be off-task more than 25% of the day, and need several unscheduled breaks.  Tr. 796-798.

On January 10, 2020, Donald returned to the Orthopedic and Sports Medicine Clinic for reevaluation of his right knee.  Tr. 935.  Voltaren gel had not provided significant, prolonged relief.  Tr. 935.  He had aching symptoms exacerbated by activity and improved with rest and the use of a cane.  Tr. 935.  His knee had given out or felt unstable and he was able to bend and straighten it to the full extent. Tr. 935.  Exam findings were the same as his prior visit.  Tr. 939.  The physician's assistant noted that Donald continued to struggle with his knee; he was using a cane and brace full time; and he did not trust his knee as it frequently gave out.  Tr. 940.  Due to his young age and well-maintained joint spaces, it was determined that Donald would benefit from an arthroscopic procedure rather than an arthroplasty, although he may not get the full benefit due to post-traumatic arthritis.  Tr. 940.

On February 3, 2020, Dr. Pfefferle performed a right partial medial mensicetomy.  Tr. 948. Following the procedure, Donald was discharged with instructions to be weight bearing as tolerated and to follow up in two weeks.  Tr. 950.

C.    **State Agency Reports**

On February 8, 2019, state agency reviewer Steve E. McKee, M.D., reviewed Donald's records and, regarding his physical residual functional capacity, opined that he could lift 20 pounds occasionally and 10 pounds frequently; stand/walk six hours in an eight hour workday; sit more than six hours in an eight hour workday; frequently operate bilateral foot controls; occasionally climb ramps and stairs but never ladders, ropes or scaffolds; frequently balance and stoop and occasionally kneel, crouch and crawl; occasionally reach overhead with the right upper extremity; and should avoid all exposure to hazards.  Tr. 266-269.  On March 20, 2019, state agency reviewing physician Gerald Klyop, M.D., reviewed Donald's records and adopted Dr. McKee's findings.  Tr. 285–288.

On February 9, 2019, state agency reviewer David Dietz, Ph.D., reviewed Donald's records and, regarding his mental residual functional capacity, opined that he could perform simple routine work tasks with three to four steps in a setting without high production quotas or fast pace; interact with others in the work setting on an occasional, superficial basis; and respond appropriately to changes in the work setting that are foreseen and/or gradually implemented.  Tr. 269-271.  On May 19, 2019, state agency reviewer Carl Tishler, Ph.D., reviewed Donald's records and adopted Dr. Dietz' findings.  Tr. 288-290.

**D.  Hearing Testimony**

During the January 16, 2020 hearing, Donald testified to the following:

- He lives in a house with his girlfriend, who is on disability and on dialysis.  Tr. 148-149.  He used to have a driver's license but it was taken away from him.  Tr. 149.  He gets around by taking the bus and he took a bus to the hearing.  Tr. 149.  He knows the bus routes; the number 2 bus goes right past his house and takes him downtown.  Tr. 174.  If he were going somewhere unfamiliar, "someone tell me where I'm going."  Tr. 174.

- The highest grade he attended in school was tenth grade.  Tr. 150.  He tried to get his GED when he was in prison about twenty years ago but he couldn't read or write.  Tr. 150.  Someone was helping him learn so he could get his GED but he "just couldn't comprehend with it."  Tr. 150.  When asked what he did with the hearing paperwork he received, he stated that he gave it to his girlfriend to read; "She do all my paperwork," including doctor's forms and work applications.  Tr. 151.  When asked if there was any level of reading or writing he could do, he answered, "Kinda spell."  Tr. 151.  He can sign and print his name and he knows "real easy ones."  Tr. 152.  If someone gave him a newspaper he could not read it and he does not know how to text on a cell phone.  Tr. 152.

- When asked what prevented him from working, he stated that his leg gives out and he can't stand more than 10, 15, or 30 minutes.  Tr. 154, 171.  His ankle hurts, then his back, "it gives out on me."  Tr. 154.  "[W]hen I walk for so far, I drop, my legs drop."  Tr. 154.  When he aches, he uses ointment that he was given to keep the pain down.  Tr. 171.  He is scheduled for right knee arthroscopic surgery on February 3.  Tr. 154.  He has pain in his right knee and left ankle; he has pins in his ankle from a surgery in 2014 or 2016.  Tr. 154-155.  When it is cold outside he can barely get up due to pain and he takes pills for arthritis.  Tr. 155.

- His knee has been giving him problems for a couple of years or a little over a year.  Tr. 156.  He had a cane at the hearing and stated that he had been using it for the past nine months.  Tr. 156.  He started using a cane because "when I walked so far I fell down."  Tr. 156.  He would lose his balance.  Tr. 156.  His primary care physician, Dr. Drolshagen, prescribed it.  Tr. 156.  He tried knee injections but they didn't help at all; that's why he's having surgery.  Tr. 157.  He is not receiving treatment for his ankle.  Tr. 157.  He is not receiving treatment for his back.  Tr. 160.  He takes ibuprofen for his back, which helps a little bit.  Tr. 160-161.

His knee throbs at night. Tr. 161. When he sits down for too long it is hard for him to get back up again. Tr. 161. His most comfortable position is sitting in a chair with his feet propped up on a stool. Tr. 171.

- He described what he did the day before the hearing, as a typical day: he got up about 9:00 a.m. and cleaned up the living room and dining room, washed dishes, went downstairs and washed a load of clothes, went back up to his room and watched a tv show. Tr. 164. He took a nap, then talked to his grandkids, who had come over his house. Tr. 164-165. When they left, he went downstairs, laid down, and went to sleep. Tr. 165. His grandkids are there for about six hours a day. Tr. 165. His 19-year-old granddaughter comes over to watch the kids. Tr. 165. He doesn't do any other chores. Tr. 167. He goes with his girlfriend to the grocery store but stays in the car while she goes in. Tr. 167. He uses "Provide a Ride" to get to doctor appointments, a friend picks him up to take him to church, and his son and daughter pick him up to take him to their house for visits. Tr. 168-169. When he visits, he plays with his grandkids, watches tv, and watches them run around the house. Tr. 169.

- When asked if he also has right shoulder problems, he stated that he does; he can only lift his arm "so high" and his shoulder is swollen. Tr. 169-170. He can lift about 10 pounds; anything more than that and he drops it. Tr. 170-171. He gets arthritis pills for his shoulder. Tr. 175. It's been a while since he's seen the doctor but he has refills on his pills. Tr. 175.

The ALJ then asked the VE whether a hypothetical individual with the same age, education and work experience as Donald could perform his past work of general laborer or any other work if the individual had the following residual functional capacity: he could perform light work; frequently operate bilateral foot controls; occasionally reach overhead on the right; occasionally climb ramps and stairs but never ladders, ropes or scaffolds; can frequently balance and stoop and occasionally kneel, crouch and crawl; must avoid unprotected heights, moving mechanical parts, and operating a motor vehicle; can hear and understand simple, oral instructions and communicate simple information; can perform simple, routine, and repetitive tasks but not at a production-rate pace; can make simple, work-related decisions; and can have no more than frequent, superficial interaction with supervisors and coworkers and no interaction with the public. Tr. 176. The VE testified that the hypothetical individual would not be able to perform Donald's past work but could perform the following representative jobs in the economy: housekeeper cleaner, hand packager, and electronic worker. Tr. 176-177. The ALJ asked the VE whether his answer would change if the individual had to use a cane to ambulate and the VE

9

stated that that limitation would preclude light work and the individual would be limited to performing sedentary work.  Tr. 177.  When asked about acceptable off-task behavior and absenteeism, the VE stated that off-task behavior above 10% and absenteeism of more than 2 days a month is unacceptable. Tr. 177.

### III. STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the

10

national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g),

404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since September 27, 2018, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: status-post gunshot wound, osteoarthritis of right knee and left ankle, mild degenerative changes in right shoulder and spine, depressive disorder, anxiety disorder, post-traumatic stress disorder, personality disorder, reading disorder, substance addiction disorder (alcohol, cocaine and marijuana abuse) (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can lift or carry twenty pounds occasionally and ten pounds frequently. He can sit for six hours, stand for six hours and walk for six hours. He can frequently operate foot controls bilaterally. He can occasionally reach overhead with the right upper extremity. The claimant can occasionally climb ramps and stairs and never climb ladders, ropes or scaffolds. He can frequently balance, stoop, and occasionally kneel, crouch and crawl. He is able to hear and understand simple oral instructions and to communicate simple information. The claimant can never work at unprotected heights, never moving mechanical parts and never operate a motor vehicle. He is able to perform simple, routine and repetitive tasks but not at a production rate pace. He is able to perform simple work-related decisions. He is able to interact frequently on a superficial basis with supervisors and coworkers, but cannot interact with the public.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on June **, 1967 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

11

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since September 27, 2018, the date the application was filed (20 CFR 416.920(g)).

Tr. 15-32.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative

12

Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. The ALJ did not err when evaluating Donald's allegations regarding his physical symptoms

Donald argues that the ALJ erred when he evaluated Donald's allegations regarding his physical symptoms and that the ALJ misconstrued the evidence. Doc. No. 16, pp. 12-16. Defendant disagrees that the ALJ misconstrued the evidence cited by Donald and argues that, even if he did, the ALJ gave

13

alternative reasons for discounting Donald's allegations regarding his symptoms.  Doc. No. 17, pp. 6-8.

A claimant's statements of pain or other symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability.  20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304.  When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms.  20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, *2-8.  First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain.  *Id*., *3-4.  Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.  *Id*. at *3, 5-8.  To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  *Id*.  In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered: daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms.  *Id*. at *7-8.  The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  *Id*. at *10.

Here, the ALJ discredited Donald's assertions that his symptoms precluded him from working:

14

> the claimant was performing a wide array of activities; including one time lifting a heavy water tank, and walking around with friends (ExB1F). Most notable, throughout the claimant was taking care of his girlfriend who was disabled. In addition, he was caring for his two young grandchildren for at least six hours during the day (ExB4E: B4F: Testimony). The claimant's ability to perform these activities further support a finding that he was capable of performing competitive employment.

Tr. 21.  Donald contends that the function report cited by the ALJ (Exhibit B4E, Tr. 417) states that Donald cares for his girlfriend, who is on dialysis, but "[s]ignificantly, the report does not indicate what Mr. Donald does to care for her."  Doc. No. 16, pp. 15-16.  Nevertheless, he does not dispute that he stated that he cared for his girlfriend, who was on disability and was on dialysis.  The ALJ's reliance upon Donald's statement in a function report was not error.  Donald argues that he testified that his girlfriend "does all the household chores except washing dishes and laundry," but Donald testified that, the day before the hearing, which was a typical day, he got up, "cleaned up" the living room and the dining room, washed dishes, washed clothes, and navigated stairs periodically throughout the day.  Tr. 164-165; Tr. 19 (ALJ commenting that Donald "to some degree was managing some of the household chores.").

Donald argues that the ALJ's finding that he cared for his grandchildren for at least six hours a day was error because he had testified that his granddaughter watched his grandchildren during the day.  Doc. No. 16, p. 15, Tr. 165.  The Court agrees that the ALJ erred when he stated that Donald cared for his grandchildren.  Nevertheless, the ALJ provided a thorough account of additional reasons why Donald's allegations of the severity of his symptoms were not consistent with the record and those reasons are supported by substantial evidence.

For example, regarding Donald's right shoulder impairment, the ALJ found that Donald injured his right shoulder while helping a friend move a water tank in March 2018; an x-ray showed mild degenerative findings and he was instructed to use ibuprofen for pain.  Tr. 21.  An exam of his right shoulder in July 2018 showed full strength, normal range of motion, no swelling, normal sensation, and

he was treated with ice and given pain medication, which improved his pain.  Tr. 22.  The ALJ acknowledged that Donald reported right shoulder pain and was found to have a decreased range of motion and positive Neer's and Hawkins tests at his consultative exam in December 2018; the ALJ also noted that he had had full strength at that exam.  Tr. 22.  The ALJ found that Donald had no further treatment of his right shoulder after July 2018 and that there was "no evidence he had difficulty lifting more than ten pounds or reaching, as asserted."  Tr. 22.  *See* SSR 16-3p, 2017 WL 5180304, at *7-8 (when evaluating a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence and treatment received); *Mausser v. Saul*, 504 F. Supp. 3d 722, 724 (N.D. Ohio 2020) (the ALJ's reliance upon mild, objective exam findings to support the conclusion that the claimant's alleged limitations due to his symptoms was not supported by the evidence was proper). The ALJ's finding that Donald had had little treatment for his right shoulder (Tr. 22, 23, 26) and did not take prescribed medication for his shoulder (Tr. 23) is an appropriate reason to discount his allegations of right shoulder symptoms.  *See* 20 C.F.R. § 404.1529(c)(3) (when evaluating symptoms, the ALJ considers the claimant's treatment);  *Francis v. Saul*, 2020 WL 5441739, at *8 (N.D. Ohio Mar. 6, 2020) (When assessing the claimant's reports of symptoms, "It was appropriate for the ALJ to consider the treatment that Francis received" including that "he sought and received no additional treatment," collecting cases)[3]; *see also Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 638 (6th Cir. 2016).

Next, with respect to Donald's right knee and left ankle pain, the ALJ observed that Donald engaged in activities of walking outside with his friend in July 2018.  Tr. 22.  During an exam at that time he had full strength in his extremities, good range of motion, and no loss of sensation or tenderness. Tr. 22.  At a consultative exam in December 2018 he reported arthritis pain in his right knee and left ankle from prior surgeries in 2016.  Tr. 22.  The ALJ noted that, upon exam, he had full strength in his lower extremities, a normal range of motion in his knees, and good mobility in his left ankle.  Tr. 23.  He

---

[3]  Report and recommendation adopted, 2020 WL 2781490 (N.D. Ohio May 29, 2020).

had a scar on his right knee that was slightly swollen, no sign of crepitus or joint changes, and no inflammation in his left ankle.  Tr. 23.  His gait was "slightly stiff" and he walked with a cane, he could heel walk and toe walk with the cane and was able to touch his toes, and he had decreased sensation in his right foot, leg and thigh to sharp sensation.  Tr. 23.  The ALJ noted the x-ray results showing surgical changes in his right knee and left ankle and minimal joint space narrowing in his right knee.  Tr. 23.

The ALJ remarked that, despite Donald's complaints regarding his right knee, he had not sought treatment for that problem until May 2019, when he reported right knee pain to his primary care physician.  Tr. 24.  He denied difficulty bearing weight, weakness, numbness and tingling, and loss of sensation.  Tr. 24.  At that exam and a consultation with an orthopedic doctor in July 2019, he had some abnormal exam findings (gait, abnormal patellar mobility in his right knee, positive grind test and abnormal meniscus, some tenderness and crepitus) and some normal findings (range of motion, no joint effusion, normal alignment, no laxity or bony tenderness, stable knee to stress testing).  Tr. 24.  The ALJ remarked that the orthopedic doctor had commented that Donald had had little, conservative treatment prior to that time and recommended conservative treatment; Donald refused physical therapy and a steroid injection at that time.  24-25.  He did have an injection in September 2019 and reported improvement in October 2019 for three to four weeks after his injection.  Tr. 25.  The ALJ remarked that Donald waited to pursue surgery until January 2020 and that he had surgery in February 2020.  Tr. 26.  The ALJ concluded that Donald had had little treatment for his left ankle, and, regarding his right knee, he had first delayed treatment; he then had little, conservative treatment, some of which he refused; and that he delayed more aggressive treatment.  Tr. 26.  That conclusion is a proper basis for the ALJ's assessment of Donald's symptoms.  20 C.F.R. § 404.1529(c)(3); *Francis*, 2020 WL 5441739, at *8; *Kepke*, 636 F. App'x at 638.

Donald takes issue with the ALJ's statements.  He argues that the ALJ's finding that he did not

17

seek treatment for his right knee until 2019 is incorrect and claims that he complained to his primary

care physician in December 2018 that he had "pain in his knees, hips, sides and back." Doc. No. 16, p.

15 (citing Tr. 715). But at that visit, a 3-month follow-up for memory loss, shoulder pain, and a

medication refill, Donald had reported "whole body joint pain since gun shot," including in both knees,

both hips, his sides, and his back. Tr. 715. He did not see his doctor at that visit for his right knee

problem. Moreover, as the ALJ noted, he was referred to pain management for his "whole body pain"

but did not follow that recommendation. Tr. 23. Thus, the ALJ's statement that Donald first sought

treatment for his right knee in May 2019 was accurate. Donald challenges the ALJ's statement that

there was no evidence he had significant difficulty standing or walking until 2019, citing his consultative

exam in December 2018 in which he was found to have "a slightly swollen right knee" and "slight

stiffness of the right knee walking with a cane and decreased sensation in the right foot, right leg and

right thigh." Doc. No. 16, p. 15 (citing Tr. 701). But he could also heel and toe walk with his cane,

stand on his toes, and bend over and touch his toes. Tr. 701. A "slight stiffness" in his right knee while

walking with a cane, the ability to heel and toe walk with a cane, and the ability to stand on his toes and

bend over and touch his toes is consistent with the ALJ's statement that Donald showed no "significant

difficulty standing or walking" prior to 2019.

       Donald submits that the record also shows that "as early as December 2018…he required a cane

for ambulation." Doc. No. 16, p. 15. But the ALJ considered Donald's use of a cane. At step three, the

ALJ noted that there was no evidence that Donald had been prescribed a cane and "no clinical findings

for the use of a cane," citing the consultative examiner's observations listed above. Tr. 17; see also Tr.

23. The ALJ discussed the consultative examiner's opinion that Donald "might have some difficulty

walking" and that he "may have to avoid doing steps" and stated that the consultative examiner "did not

assess whether the claimant had the ability to walk without the use of a cane." Tr. 23. The ALJ noted

that Donald presented with full muscle strength at that exam, which is inconsistent with the need for a cane, Tr. 17, 23, and that there was no record that Donald had been prescribed the cane for balance, Tr. 17 (ALJ remarking that he had asked counsel at the hearing to locate a prescription for the cane but that counsel had been unable to do so).  The ALJ commented that Donald had a normal gait and station at an exam on May 7, 2019.  Tr. 17.  Finally, the ALJ wrote that Donald had right knee surgery on February 3, 2020; he was advised that he could stop using crutches when he could walk comfortably within three to five days after the surgery; and that there was no evidence he had difficulty standing and walking without an assistive device since then.  Tr. 26.  In sum, Donald has not shown that a cane was medically necessary and that the ALJ erred when evaluating his need for a cane.  *See* SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996) ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed.").

The ALJ's evaluation of Donald's allegations regarding his physical symptoms is supported by substantial evidence.

## B. The ALJ's finding that Donald had a limited education is not supported by substantial evidence

In his decision, the ALJ found that Donald had a "limited education."  Tr. 30.  Donald argues that the ALJ erred when he found that Donald had a limited education and "unreasonably rejected [his] allegation of illiteracy."  Doc. No. 16, p. 16.  He submits that if he were determined to be illiterate, he would be found disabled pursuant to Rule 202.09 in Table No. 2 of 20 C.F.R. Pt. 404, Subpt. P, App. 2, which indicates that an individual closely approaching advanced age who is limited to light, unskilled work is disabled.  Doc. No. 16, p. 18; Tr. 145.  Defendant does not disagree with Donald's legal conclusion but argues that evidence in the record supports the ALJ's finding that Donald had a limited education and is not illiterate.  Doc. No. 17, pp. 9-11.

In support of his determination that Donald had a limited education and is not illiterate, the ALJ noted that Donald attended high school through the tenth grade. Tr. 31. The regulations state that an ALJ will "generally consider that a 7th grade through the 11th grade level of formal education is a limited education." 20 C.F.R. § 404.1564(b)(3). "Illiteracy," in turn, is defined as "the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." § 404.1564(b)(1). However, "the numerical grade level that [a claimant] completed in school may not represent [the claimant's] actual educational abilities. These may be higher or lower" based on "other evidence to contradict" the numerical grade level. § 404.1564(b); *see also Skinner v. Sec'y of Health & Hum. Servs*., 902 F.2d 447, 450 (6th Cir. 1990) ("A numerical grade level is properly used to determine a claimant's educational abilities only if contradictory evidence does not exist," citing 20 C.F.R. § 404.1564(b)). Here, there was other evidence presented that contradicts a finding that Donald had a limited education.

The ALJ discussed the evidence in the record regarding Donald's alleged illiteracy. Tr. 31. First, the ALJ stated, "The previous Administrative Law Judge concluded there was no evidence to support that assertion since the psychologist that assessed the claimant concluded that the claimant was *malingering* regarding his ability to read and write since he put forth little effort during that assessment (ExB2A/10)." Tr. 31 (emphasis in original). But, as Donald asserts, the prior ALJ did not explain his conclusion regarding his finding that Donald had a limited education.[4] Doc. No. 16, p. 17; Tr. 245. Thus, the current ALJ furnished reasoning for the prior ALJ's conclusion that the prior ALJ did not make. And the ALJ's citation to the record (ExB2A/10, Tr. 262) was not to the prior ALJ's decision but

---

[4] The prior ALJ resolved Donald's claim at step four, finding that he was capable of performing his past relevant work as a general laborer. Tr. 244. The ALJ went on to make alternative findings in the remainder of his decision, including Donald's education level, which did not include an explanation. Tr. 245. The ALJ also stated that, even if Donald was illiterate, he could still perform the medium-level jobs the ALJ had cited. Tr. 246.

to the evaluation of Donald's current application at the initial level, which referenced a 2007 consultative exam Donald had had for his prior application.  That record, describing the 2007 consultative exam, states, "The claimant appeared to put forth minimal effort and may have exhibited some features of malingering, although this could not be determined with any degree of accuracy."  Tr. 262.  That statement by the state agency on initial review also does not show that the prior ALJ concluded that Donald was malingering.[5]  Tr. 235.  Nor does it resolve the fact that the observation of possible malingering was qualified by a warning that such a determination was not made "with any degree of accuracy."  Thus, although the prior ALJ's conclusion that Donald was not illiterate provides some evidence to support the ALJ's finding, the ALJ mischaracterized the extent of the prior ALJ's findings.

Next, the ALJ cited additional evidence to explain why he found that Donald was not illiterate, but that evidence does not support his conclusion.  The ALJ remarked that he left the record open for Donald to submit educational records showing he was illiterate and that Donald failed to submit any. Tr. 31.  But the ALJ had commented at the hearing that Donald was unlikely to submit any, undercutting the importance he places on Donald's inability to obtain educational records.  Tr. 179 (ALJ stating that "it wouldn't surprise me" if Donald was unable to obtain special education records indicating that he was illiterate and that "they're 30 years old, anyway.").  The ALJ stated that Donald had "previously obtained a driver's license and could drive, indicated he was able to read street signs (ExB4E: Testimony).  He drove himself to the hospital, which indicated he could read (ExB1F)."  But the ALJ did not ask Donald at the hearing how he obtained his driver's license or how he was able to drive himself to the hospital.  At his prior hearing, Donald had testified that his driver's test was read out loud to him and that, when he drove, it was based on memory and familiarity with his surroundings.  Tr. 230. The ALJ ignored those explanations, which were plausible.  The ALJ also ignored Donald's testimony

---

[5] Donald's WRAT-4 results indicated that his reading was at the kindergarten level.  Tr. 235.

that he knew the number of the city bus that took him downtown and that, if he didn't know what bus to take if he was going somewhere new, he would ask someone.  Tr. 174.

The ALJ stated, "Donald admitted that the only reason he did not obtain a GED was due to his incarceration, not because[] he could not read or write."  Tr. 31.  That statement is false.  At the hearing, Donald explained that he tried to obtain a GED when he had been incarcerated but could not, despite having help from a teacher, because he "couldn't read, couldn't write….Just couldn't comprehend with it."  Tr. 150.  The ALJ cited Donald's assertion that he "would *go to the library* to rent movies" (Tr. 31, emphasis in original) as further proof that he was able to read but does not explain why selecting movies at the library indicates an ability to read.

The ALJ wrote,

> At the hearing, the claimant testified that his girlfriend would read letters from the agency and provide assistance with job applications. However, for this case, the claimant was able to read and write to complete the function report and used self-describing words *[I and I am]* in his responses. Furthermore, there was no evidence another person *wrote the responses* on the form, since it was the claimant, who printed-his name and then dated this report (ExB4E). The claimant advised the agency, *he was completing and submitting the form* (ExB2A).

Tr. 31 (emphasis in original).  At the hearing, Donald testified that his girlfriend did more than just "read letters from the agency and provide assistance with job applications."  Donald stated that his girlfriend "do all my paperwork," including filling out forms.  Tr. 151.  The fact that the person who filled out Donald's function report used the first person, "I," does not prove that Donald wrote the answers on the form.  And Donald did not advise the agency that "he was completing and submitting the form" for his disability case—his representative told the agency that Donald was completing and submitting the form. Tr. 259.  The ALJ reads too much into that casual comment.

Finally, consultative examiner Dr. Benson-Blankenship observed that the records from Donald's prior consultative exam showed that he was "functionally illiterate" and she wrote that he had a "low level of literacy."  Tr. 709, 712.  The ALJ found Dr. Benson-Blankenship's opinion to be persuasive

22

without explaining her findings regarding Donald's literacy. On remand, the ALJ will have an opportunity to revisit that opinion and the evidence of record regarding Donald's education level.

In sum, the evidence relied upon by the ALJ does not support his finding that Donald had a limited education, and remand is warranted. *Skinner*, 902 F.2d at 451.[6]

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED for proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Date: December 13, 2021

    *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

---

[6] In *Skinner*, the court remanded for an award of benefits based on "overwhelming evidence that Mr. Skinner is illiterate." 902 F.2d at 451. This Court does not find overwhelming evidence that Donald is illiterate; that is a determination for the ALJ on remand.